COCHRAN *et al. v.* SHOENBERGER *et al.*

(*Circuit Court, W. D. Pennsylvania.* June 17, 1887.)

1. PARTITION—ALLOTMENT—IN EQUITY—ADVANTAGE TO ONE OF THE PARTIES.
    In a court of equity, in a case of partition, such part of the land as may be more advantageous to one of the parties, on account of its proximity to his other land, or for any other reason, will be allotted to him if it can be done without injury to the others.

2. SAME—ALLOTMENT—IN EQUITY—ACT PA. APRIL 22, 1856.
    The Pennsylvania act of twenty-second April, 1856, which directs that the allotment shall be made to such of the parties as shall, "at the return of the rule to accept or refuse to take at the valuation," offer the highest price above the valuation returned, was intended to regulate proceedings in partition in the common-law courts, and the orphans' court; but proceedings in a court of equity, which are to be moulded to meet the varying equities of the parties, are not controlled by the act.

3. SAME—ALLOTMENT—IN EQUITY—PARTICULAR VALUE TO PARTY.
    If one of the parties must have, or ought to have, a particular purpart because of its contiguity and relation to his other property, justice requires that

it should be assigned to him at what it is really worth,—its fair market value if offered to others not so circumstanced,—and he should not be coerced by the other party by means of bidding into paying more.

In Equity.   On exceptions to master's report.

This was a bill for partition by James Cochran and others, against Geo. K. Shoenberger and others.   Defendants filed exceptions to the report of the master.

*H. & G. C. Burgwin*, for complainants.

*George Shiras, Jr.*, for defendants.

ACHESON, J.   There is no lack of authority for the proposition that, in cases of partition, a court of equity, proceeding upon the ground of its general equity jurisdiction, administers its relief *ex æquo et bono*, and by its decree adjusts the equitable rights of all the parties.   1 Story, Eq. Jur. § 656*b*.   For example, where one joint owner has put improvements on the property, either the part so improved will be assigned to him at the value of the land without the improvements, or compensation will be adjudged to him.   *Hall* v. *Piddock*, 21 N. J. Eq. 311. Again, such part of the land as may be more advantageous to one of the parties on account of its proximity to his other land, or for any other reason, will be allotted to him, if it can be done without injury to the others.   *Story* v. *Johnson*, 1 Younge & C. 538; *Hall* v. *Piddock, supra; Gaithers* v. *Brown*, 7 B. Mon. 90; *Graham* v. *Graham*, 8 Bush. 334.   It is quite clear to me that these equitable principles should have full sway and a controlling effect in the present case, unless, as is claimed, there is a positive statutory rule to which the court must conform.

The property here in question consists mainly of coal; and, as the master has determined, it is naturally divided by the line of the Pittsburgh, McKeesport & Youghiogheny Railroad, into two parts, designated by him as purparts A and B, the former containing 209.58 acres of coal and 3.9 acres of surface, and the latter containing 228.52 acres of coal and about 3.1 acres of surface.   The master fixed the value of purpart A at $53,175, and the value of purpart B at $69,175.   Purpart A adjoins a tract of land owned by the plaintiffs, containing about 160 acres, upon which they have a large coke plant of 143 ovens, with all necessary machinery and appliances.   Purpart A, therefore, has a peculiar value to the plaintiffs, and it is a matter of considerable importance to them that it should be allotted to them.   Recognizing their equity the master assigned to the plaintiffs purpart A, and he allotted to the defendants purpart B, charged with $8,000 of owelty, to equalize the partition.

The defendants filed with the master exceptions to his report, one of them being that "the master should have called for bids from the parties to the cause upon the respective purparts;" and accompanying the exceptions there was a written offer on the part of the defendants "to take purpart A without exacting any owelty from purpart B, and to pay an advance of $1,000 upon said purpart A."   But the master declined to change his allotments or report, and, without passing upon the excep-

tions, appended them to and returned them with his report to the court. Here the exceptions have all been renewed, and the defendants have also moved the court to set aside the master's report, and "accept the offer of the defendants to take purpart A at an equal valuation with purpart B, or to take either purpart at an equal valuation." No evidence was offered before the master, and none has been presented to the court, to controvert the evidence upon which the master fixed his valuations, or to impeach the correctness of the valuations. The defendants rely altogether on their offer, claiming that the case is controlled by the act of assembly of April 22, 1856, (P. L. 534; 2 Purd. 1294, pl. 25,) which is in the words following:

"In all cases of partition of real estate, in any court, wherein a valuation shall have been made of the whole or parts thereof, the same shall be allotted to such one or more of the parties in interest, who shall, at the return of the rule to accept or refuse to take at the valuation, offer, in writing, the highest price therefor above the valuation returned; but if no higher offer be made for such real estate or any part thereof, it shall be allotted or ordered to be sold as provided by law."

Whether this statutory right of bidding, if it were shown to be applicable to suits in equity in the courts of Pennsylvania, is such a rule of property as would control equitable proceedings in this court upon a bill for the partition of real estate, is a question which need not be definitively passed on at this time. The decisions of the supreme court of Pennsylvania seem to treat the act rather as prescribing a rule of procedure than as conferring a positive right. At any rate, the tendency of those decisions is to restrict the operation of the act to the narrowest limits. Thus, in *Klohs* v. *Reifsnyder*, 61 Pa. St. 240, it was held that each party can make one offer only, and that the parties may be compelled to hand in their bids together, or permitted to seal them up until the court shall order them all to be opened. And AGNEW, J., speaking for the court, says:

"The purpose of the act certainly was to enable the parties to correct unfairness or under-valuation, and make the premises command the highest price. In this view a second bid would be but fair. But, on the other hand, overbidding leads to unfairness, and incites parties to a series of feints in bidding to enable one to overreach another. Selfish, or even malicious, pertinacity may force one who must have the property to pay more than its worth, or greater wealth may, for unfair purposes, bid it away from one who must have it." Id. 244.

In *Bartholomew's Appeal*, 71 Pa. St. 291, it was again ruled that a party having made one bid was not entitled to another; and it was also held that the bids should be in writing, and that the land should not be offered to any of the heirs until all are brought in by rule. In the course of the opinion Chief Justice THOMPSON says: "In *Klohs* v. *Reifsnyder*, our brother AGNEW has shown, with striking clearness, the impropriety of bidding and overbidding in cases of partition." And in the last case, in which the court was called on to consider the act, (*Wistar's Appeal*, 105 Pa. St. 390) it was decided that the act did not apply at all if the land of the decedent could be divided into as many parts of equal value as

there are heirs. "By its express terms" (says STERRETT, J.) "the section above quoted is applicable only to cases where an appraisement or valuation has been made and returned." Id. 397.

Was it intended that this act should be obligatory upon courts of equity, when the very principles upon which those tribunals originally obtained jurisdiction in partition require that the proceedings should be so moulded as to meet the varying equities of the parties? It has not been so determined by the supreme court of Pennsylvania, nor by any court, so far as I am advised. In ascertaining the scope of the act of April 22, 1856, regard should be had to the state of the law at and immediately before the date of the act. In cases of partition there was then no general jurisdiction in equity in Pennsylvania. By a local statute (act of March 17, 1845, P. L. 160; 1 Purd. 694, pl. 22) such jurisdiction existed within the city and county of Philadelphia. But elsewhere the only remedies, and in the named locality the usual remedies, for enforcing partition were by the common-law writ and by petition in the orphans' court. Now, in these proceedings, in cases where the inquest or commissioners of partition returned a valuation of the land as a whole or in parts, the right of election was governed by rules having little foundation in good reason. In the orphans' court, election was by sex and seniority; in the common-law action, the parties were entitled to take according to the dates of their respective titles. Act of March 29, 1832; P. L. 201; 1 Purd. 540, pl. 161; Act of May 5, 1841; P. L. 353; 2 Purd. 1293, pl. 24. To effect such election, after the valuation was made and returned,. the court issued a rule upon the heirs or parties to come in and accept or refuse to take the land, or parts thereof, at the valuation. 1 Purd. 541, pl. 165; 2 Purd. 1293, pl. 24. Read in the light of these provisions of the law, is it not plain that the purpose of the act was to introduce a more reasonable rule of allotment, and one promotive of better results, than election by sex or by seniority of parties or titles? The language of the act of 1856, is very apposite, as applied to the proceedings in partition in the orphans' court and in the common-law courts, and its provisions perfectly fit into those systems. But both in spirit and in letter the act of 1856 is foreign to the system of equitable partition. Courts of equity were not trammeled by such rules of election as above mentioned. And then, the language of the act is not properly applicable to the course of procedure in a court of equity upon a bill for a partition. Therein no such rule is granted as is contemplated by the act, nor is such rule appropriate to the procedure. The mode in which partition is effected in equity is that, after the interests of the parties are ascertained, a commission is issued to persons nominated by the parties, or by the court, directing them to make partition of the estate, and to allot their respective shares to the several parties, and to make return of their having done so to the court. Adams, Eq. *231. In making partition the commissioners are guided by equitable principles, and, if necessary, the court will issue special instructions to them; and their action is always subject to the approval of the court. Id. *Story* v. *Johnson*, 2 Younge & C. 586; *Hall* v. *Piddock, supra.*

The subsequent legislation evinces that equitable partitions are not to be regulated by the act of April 22, 1856. It was provided by the act of March 14, 1857, (P. L. 97,) which was supplementary to the above-mentioned local statute of March 17, 1845, and is again provided by the general act of May 8, 1876, (P. L. 134; 1 Purd. 694, pl. 23,) that in all cases of partition in equity, after the decree for partition, the cause shall be referred to a master, or to a master and a commissioner, to divide and partition the land into purparts, and to value the same and fix the owelty, and that the master shall then award and allot the purparts to the parties entitled, subject to the approval of the court. These acts prescribe a mode of procedure conforming substantially to the usual course of equity practice in such cases, (Adams, Eq. *231,) and inconsistent with the provisions of the act of 1856. Undoubtedly it would always be proper for a master to entertain and consider an apparently fair offer by any of the parties to take a purpart at a price above the valuation. In some cases it might well be that allotment upon the basis of the highest offers would be conducive to the general benefit of the parties, and right. But to make this rule imperative in all cases of equitable partitions would tend to defeat the remedial justice peculiar to courts of equity. If one of the parties must have, or ought to have, a particular purpart because of its contiguity and relation to his other property, justice requires that it should be assigned to him at what it is really worth,—its fair market value if offered to others not so circumstanced, —and he should not be coerced by the other party, by means of bidding, into paying more.

Upon the whole, then, I am of the opinion that the act of assembly of April 22, 1856, does not control this case, and that the master was not bound to call for or accept bids. But the defendants having offered a large advance upon the valuation of purpart A, it would have been well for the master to carefully re-examine the grounds of his valuations, to see whether or not he had fallen into any mistake. This I do not understand the master to have done. Indeed, he reports that he declined to pass on the defendants' exceptions. Therefore, it seems to me proper to recommit the case to the master, with directions to re-examine the grounds of his valuations, and dispose of the defendants' exceptions. And inasmuch as the defendants have acted under a misapprehension as to the bearing of the act of 1856 upon the case, I think the master should give them, even yet, an opportunity of producing evidence to show incorrectness in the valuations. And, if the case is thus reopened at the instance of the defendants, the plaintiffs should be allowed to present further evidence.

And now, June 17, 1887, the case is recommitted to the master, with directions to proceed therein in accordance with this opinion.